An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA14-1116

Filed: 1 September 2015

From the Disciplinary Hearing Commission of the N.C. State Bar, No. 13 DHC 13

THE NORTH CAROLINA STATE BAR, Plaintiff,

v.

WILLIAM S. BRITT, Attorney, Defendant.

Appeal by defendant from order entered 22 April 2014 by the North Carolina State Bar Disciplinary Hearing Commission. Heard in the Court of Appeals 17 March 2015.

> *The North Carolina State Bar, by Deputy Counsels David R. Johnson and Maria Brown, for plaintiff-appellee.*
>
> *Ronnie M. Mitchell for defendant-appellant.*

McCULLOUGH, Judge.

Attorney William S. Britt ("defendant") appeals from an order of discipline issued by the Disciplinary Hearing Commission ("DHC") of the North Carolina State Bar ("State Bar"). In the order of discipline, the DHC found defendant had committed numerous violations of the North Carolina Rules of Professional Conduct and ordered defendant disbarred. For the following reasons, we affirm the order of discipline.

I.        Background

Defendant was licensed to practice law in North Carolina in 1981 and actively engaged in the practice of law and maintained a law office in Lumberton, North Carolina, during the times relevant to this case. In connection with defendant's law practice, defendant maintained a client trust account (the "trust account") with RBC Bank between 1 January 2009 and 20 May 2011 in which defendant deposited and disbursed client funds.

On 8 April 2013, the State Bar initiated this disciplinary action against defendant by filing a complaint with the DHC alleging the mishandling of client funds and the mismanagement of the trust account in violation of the following rules of the Rules of Professional Conduct: 1.4(a)(3) (failing to keep client reasonably informed); 1.15-2(a) (failing to properly maintain entrusted funds); 1.15-2(b) (failing to promptly deposit entrusted funds in trust account); 1.15-2(f) (failing to maintain entrusted funds separate from the property of the lawyer); 1.15-2(j) (benefiting from entrusted funds); 1.15-2(l) (failing to notify client of the receipt of entrusted funds); 1.15-2(m) (failing to properly disburse entrusted funds); 1.15-3(d) (failing to reconcile the trust account quarterly); 8.4(b) (engaging in criminal conduct that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer); and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

Defendant filed an answer to the complaint on 22 May 2013 admitting to most of the factual allegations underlying the State Bar's claims. The only factual

allegations denied by defendant were that he (1) failed to notify a client of settlement checks he received for the client and (2) endorsed the settlement checks for the client without the client's permission. In contrast to the State Bar's allegations, defendant claimed he gave proper notification of the receipt of the settlement checks to the client and was granted permission by the client to endorse each settlement check and to deposit the settlement checks into the trust account.

Subsequent to defendant's answer, the State Bar filed a motion for summary judgment on 10 July 2013. In the motion, the State Bar abandoned the factual allegations denied by defendant and the corresponding allegations that defendant violated Rules 1.4(a)(3), 1.15-2(l), 8.4(b), and 8.4(c). The State Bar then asserted the admitted factual allegations constituted rule violations warranting discipline, specifically disbarment. The State Bar contended the issue of whether the rule violations justified disbarment was a question of law and, therefore, summary judgment was appropriate. On 24 August 2013, defendant filed a response to the State Bar's motion for summary judgment. Although defendant acknowledged his admission to the substantial majority of the factual allegations in the complaint, defendant claimed he "specifically denies any allegations or inferences that [he] engaged in any willfully wrongful conduct" and contended "[t]he facts admitted . . . do not prove the . . . rule violations alleged[.]" Defendant further claimed additional evidence was needed to determine the appropriate discipline and the State Bar was

unable to demonstrate intent or significant or potential harm to clients, the public, the administration of justice, or the legal profession. The State Bar filed a reply to defendant's response on 4 September 2013.

After considering the pleadings, other materials, and arguments presented by the parties, the DHC filed an order granting partial summary judgment in favor of the State Bar on 18 November 2013. The DHC specifically determined "there [were] no genuine issues as to any material fact regarding the violation of Rules 1.15-2(a), (b), (f), (j) and (m) and Rule 1.15-3(d), and that [the State Bar was] entitled to partial summary judgment in its favor as a matter of law as to those violations." The DHC, however, "reserve[d] for hearing the question of whether [d]efendant violated Rules 8.4(b) and (c) of the Rules of Professional Conduct." Thus, in addition to granting the State Bar's motion for summary judgment in part and denying the State Bar's motions in part, the DHC ordered that a hearing be scheduled on the remaining issues of "a) whether [d]efendant violated Rules 8.4(b) and (c) of the Rules of Professional Conduct and b) what discipline, if any, is appropriate."

Those remaining issues came on for hearing before the DHC on 17 January 2014 and 28 March 2014. An order of discipline was then filed by the DHC on 22 April 2014 and later personally served on defendant on 29 April 2014. Pursuant to the order, defendant was disbarred.

On 1 May 2014, defendant filed a motion for reconsideration and to set aside the order of discipline. Along with the above motion, defendant also filed a motion to stay the order of discipline so that he could continue to practice law. The State Bar filed responses opposing defendant's motions on 9 May 2014 and, on 13 May 2014, the DHC filed orders denying defendant's motions. Defendant then filed notice of appeal from the order of discipline on 22 May 2014.

## II. Discussion

Defendant raises two issues on appeal: whether the DHC (1) erred by excluding defendant's CPA as an expert witness and (2) failed to make sufficient findings and conclusions to support its determination that defendant engaged in misconduct for which disbarment was warranted.

### A. Expert Witness

During the disciplinary hearing on 17 January 2014, defendant called Robert Norman, a CPA, as his first witness to testify that defendant did not act in a manner consistent with criminal acts. Norman testified that he had been in practice for over forty years and, as part of his practice, has helped ten to twelve attorneys review trust accounts. For purposes of the present case, Norman testified that he reviewed the trust account and determined it was not balanced and there was a shortage. When defendant asked Norman whether his practice included what would be considered forensic accounting, Norman explained that "[m]ost all accounting is

forensic, quite frankly[,]" because "[e]verything happened yesterday." Defendant then questioned whether Norman looked for evidence of embezzlement or fraud in his review of the trust account and the State Bar objected on the basis that "[defendant] hasn't established [Norman] is qualified to determine whether embezzlement or fraud has taken place." The DHC sustained the State Bar's objection.

In order to qualify Norman as an expert, defendant questioned Norman further on his background. In response, Norman testified that he had previously reviewed other accounting cases with his partner who had clients going to court. Based on his knowledge, training, and experience, Norman testified he believed he had the expertise to make an embezzlement or fraud determination. Norman testified that when making such a determination,

> [y]ou look for things out of the ordinary. You look for a reason for somebody to embezzle money or commit fraud. An intent on their part. When you sit and talk with them, you can tell pretty much--pretty quickly whether or not they're telling you the truth or not. Most people who commit embezzlement or fraud will not look you straight in the face, and they definitely won't look at you eye-to-eye. Some do, but those are really professionals. But most of the ones that I've seen would not.

Norman then testified that people attempting to embezzle money or commit fraud will sometimes make up invoices and write checks to sham companies; and he looks for those things when performing audits.

When defendant then sought to tender Norman as an expert witness in forensic accounting following Norman's additional testimony, the State Bar requested a *voir*

*dire.* In response to the State Bar's questioning during *voir dire*, Norman indicated he had testified about accounting practices in several prior cases, but never concerning attorneys' accounts. Norman had only reviewed attorneys' trust accounts at the request of the attorneys who operated them in order to make sure they were balanced. Lastly, when asked what training he had in forensic accounting, Norman reiterated his prior testimony that accounting, by nature, is forensic because it deals with the past. Norman, however, also acknowledged there are credentials for forensic accounting that he had neither sought, nor received.

Upon the conclusion of the *voir dire*, the State Bar objected to Norman's designation as an expert, noting "he's not certified in it[,]" "he hasn't handled very many attorneys' accounts[,]" and "it sounds like he does regular accounting and has very little experience with presenting those results in court." In response, defendant argued Norman is a very experienced accountant and could add information that would be beneficial to the DHC.

After conferring off the record, the DHC sustained the State Bar's objection to Norman being admitted as an expert, precluding Norman from offering his opinion as to whether or not there was embezzlement or fraud. Norman was, however, allowed to testify about what he observed and found during his review of the trust account. When defendant sought clarification on the ruling, the DHC reiterated that its decision was based on Norman's experience and background.

Now on appeal, defendant first argues the DHC's exclusion of Norman as an expert witness constitutes reversible error.

> It is well-established that trial courts must decide preliminary questions concerning the qualifications of experts to testify or the admissibility of expert testimony. When making such determinations, trial courts are not bound by the rules of evidence. In this capacity, trial courts are afforded wide latitude of discretion when making a determination about the admissibility of expert testimony. Given such latitude, it follows that a trial court's ruling on the qualifications of an expert or the admissibility of an expert's opinion will not be reversed on appeal absent a showing of abuse of discretion.

*Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004) (citations and quotation marks omitted). However, "[w]here the [defendant] contends the trial court's decision is based on an incorrect reading and interpretation of the rule governing admissibility of expert testimony, the standard of review on appeal is *de novo.*" *Cornett v. Watauga Surgical Grp., P.A.*, 194 N.C. App. 490, 493, 669 S.E.2d 805, 807 (2008).

Here, defendant argues the DHC applied the wrong standard to determine the admissibility of expert testimony under N.C. Gen. Stat. § 8C-1, Rule 702(a), and erred in sustaining the State Bar's objection to Norman's opinion testimony. We review the standard applied *de novo* and the trial court's analysis for abuse of discretion.

Regarding the standard applied, defendant contends the DHC improperly applied the standard related to scientific evidence set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469 (1993), to the proffered

testimony of Norman instead of the standards adopted by the North Carolina Supreme Court in *State v. Goode*, 341 N.C. 513, 461 S.E.2d 631 (1995), and *Howerton v. Aria Helmet, Ltd.*, 358 N.C. 440, 597 S.E.2d 674. Upon review, we are not persuaded the trial court applied the incorrect standard and, notwithstanding the standard applied, hold the DHC did not abuse its discretion by excluding Norman's opinion testimony.

Rule 702 of the North Carolina Rules of Evidence governs testimony by experts. The current version provides, in pertinent part, as follows:

> (a) If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
>
> (1) The testimony is based upon sufficient facts or data.
>
> (2) The testimony is the product of reliable principles and methods.
>
> (3) The witness has applied the principles and methods reliably to the facts of the case.

N.C. Gen. Stat. § 8C-1, Rule 702 (2013).

In *Daubert*, the United States Supreme Court held the long recognized "general acceptance" test for the admissibility of expert opinion based on scientific evidence formulated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), was superseded by Rule 702 of the Federal Rules of Evidence ("Federal Rule 702"). 509

U.S. at 587, 125 L. Ed. 2d at 479. In so holding, the Court noted that although there was no longer a general acceptance standard, under Federal Rule 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[1] 509 U.S. at 589, 125 L. Ed. 2d at 480. Thus, when

> [f]aced with a proffer of expert scientific testimony, . . . the trial judge must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Id.* at 592-93, 125 L. Ed. 2d at 482 (footnotes omitted). Throughout the opinion, the Court emphasized the flexible inquiry envisioned in Federal Rule 702 focuses on whether "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597, 125 L. Ed. 2d at 485. The Court then went on to explain what may be shown to establish the reliability of scientific evidence.

Subsequent to *Daubert,* in *Goode* and *Howerton*, the North Carolina Supreme Court addressed the standard to be applied in admitting expert testimony under the versions of North Carolina Rule 702 in effect at the time of the decisions. Those versions of Rule 702 were nearly identical to the current version of Rule 702 except

---

[1] The Court in *Daubert* repeatedly referred only to scientific evidence. Yet, the Court explained in a footnote that "[Federal] Rule 702 also applies to 'technical, or other specialized knowledge.' [The] discussion is limited to the scientific context because that is the nature of the expertise offered [in the case]." 509 U.S. at 590 n.8, 125 L. Ed. 2d at 481 n.8.

that they did not include the three requirements now enumerated in subsection (a).

*See Goode*, 341 N.C. at 527, 461 S.E.2d at 639; *Howerton*, 358 N.C. at 458, 597 S.E.2d

at 686. Citing *Daubert*, the *Goode* Court explained as follows:

> [U]nder our Rules of Evidence, when a trial court is faced with a proffer of expert testimony, it must determine whether the expert is proposing to testify to scientific, technical, or other specialized knowledge that will assist the trier of fact to determine a fact in issue. As recognized by the United States Supreme Court in its most recent opinion addressing the admissibility of expert scientific testimony, this requires a preliminary assessment of whether the reasoning or methodology underlying the testimony is sufficiently valid and whether that reasoning or methodology can be properly applied to the facts in issue.

341 N.C. at 527, 461 S.E.2d at 639 (citing *Daubert*, 509 U.S. 579, 125 L. Ed. 2d 469).

The Court then adopted a three-step inquiry for evaluating the admissibility of expert

testimony. *Id*. at 527-29, 461 S.E.2d at 639-41.

In *Howerton*, the Court listed the three steps: "(1) Is the expert's proffered

method of proof sufficiently reliable as an area for expert testimony? (2) Is the

witness testifying at trial qualified as an expert in that area of testimony? (3) Is the

expert's testimony relevant?" *Howerton*, 358 N.C. at 458, 597 S.E.2d at 686 (citing

*Goode*, 341 N.C. at 527-29, 461 S.E.2d at 639-41). In determining reliability in the

first step, where there is no precedent, "a court may look to testimony by an expert

specifically relating to the reliability, may take judicial notice, or may use a

combination of the two." *Goode*, 341 N.C. at 530, 461 S.E.2d at 641. Under the second

step, "[i]t is not necessary that an expert be experienced with the identical subject

matter at issue or be a specialist, licensed, or even engaged in a specific profession. It is enough that the expert witness because of his expertise is in a better position to have an opinion on the subject than is the trier of fact." *Id.* at 529, 461 S.E.2d at 640 (internal quotation marks and citations omitted). In judging relevancy under the third step, "expert testimony is properly admissible when such testimony can assist [the fact finder] to draw certain inferences from facts because the expert is better qualified than the [fact finder] to draw such inferences." *Id.* at 529, 461 S.E.2d at 641.

After reviewing the *Goode* three-step inquiry, the *Howerton* Court addressed whether North Carolina had implicitly adopted the federal *Daubert* standard. *Howerton*, 358 N.C. at 458, 597 S.E.2d at 686. Although the Court noted similarities between the principles underlying *Goode* and *Daubert*, the Court distinguished the North Carolina approach, noting "[it] is decidedly less mechanistic and rigorous than the 'exacting standards of reliability' demanded by the federal approach." *Id.* at 464, 597 S.E.2d at 690.

Defendant now argues application of "less mechanistic and rigorous" *Goode* inquiry in the present case should have resulted in the admission of Norman's expert opinion testimony because his testimony would have benefitted the trier of fact.

Upon review, there is no indication that the DHC applied the *Daubert* standard in this case. In sustaining the State Bars' objection to Norman's testimony, the DHC

noted only that it based its decision on Norman's experience and background. Nevertheless, if the DHC did apply the *Daubert* standard, it did not err. Although our Supreme Court held in *Howerton* that North Carolina is not a *Daubert* jurisdiction, *see id*. at 469, 597 S.E.2d at 693, this Court has recently acknowledged that the October 2011 amendment to Rule 702, as quoted above, mirrors Federal Rule 702 and "represents a departure from our previous understanding of Rule 702, which eschewed the Supreme Court's decision in *Daubert*. Given the changes . . . it is clear that amended Rule 702 should [now] be applied pursuant to the federal standard as articulated in *Daubert*." *State v. McGrady*, __ N.C. App. __, __, 753 S.E.2d 361, 367 (citation omitted), *review allowed*, 367 N.C. 505, 758 S.E.2d 864 (2014); *see also Wise v. Alcoa, Inc.*, __ N.C. App. __, __ n. 1, 752 S.E.2d 172, 175 n. 1 (2013); *Pope v. Bridge Broom, Inc.*, __ N.C. App. __, __, 770 S.E.2d 702, 707-08 (2015).

Moreover, assuming arguendo that *Daubert* does not apply, the trial court did not abuse its discretion in sustaining the State Bar's objection under the *Goode* standard. As noted above, the DHC's decision was based on Norman's experience and background. While the *Goode* Court explained that the witness need not be experienced with the identical subject matter or be certified, we cannot hold the DHC abused its discretion in this case where defendant specifically tendered Norman as an expert in forensic accounting. Although Norman had years of experience in accounting, he had reviewed very few attorneys' trust accounts for the number of

years in practice. Moreover, while Norman did explain his procedure for analyzing accounts for embezzlement or fraud, Norman did not indicate how many times he had reviewed accounts for embezzlement or fraud. Norman only testified that he had reviewed accounts with his partner and had testified in court on prior occasions concerning accounting practices, but never regarding attorneys' trust accounts. Despite acknowledging there were credentials for forensic accounting which he had not sought, nor received, Norman believed he had the requisite experience to make an embezzlement or fraud determination because "[m]ost all accounting is forensic."

Where Norman was tendered as an expert in forensic accounting, we cannot say the DHC abused its discretion in sustaining the State Bar's objection in this case.

Additionally, we note there are questions as to the reliability of Norman's method and whether his testimony would have been helpful to the DHC. Norman explained that his process for making an embezzlement or fraud determination was based, at least in part, on his impression of the person suspected of embezzlement or fraud when he speaks with them. Norman testified that he could tell pretty quickly whether or not the person is telling the truth based on whether the person would look him straight in the face. Norman, however, also indicated that some people will look you in the face even if they were not telling the truth, "but those are really professionals."

Regardless of the standard applied, Norman's testimony did not establish his methodology as reliable, but instead raised further doubt as to the reliability.

## B.    DHC's Order

Defendant next argues the DHC failed to make sufficient findings and conclusions to support its determination that defendant should be disbarred, which he asserts is an unwarranted, unduly harsh, and disproportionate punishment.

"We review the DHC's order of discipline under the 'whole record' test." *N.C. State Bar v. Adams*, __ N.C. App. __, __, 769 S.E.2d 406, 411 (2015) (citing *N.C. State Bar v. Talford*, 356 N.C. 626, 632, 576 S.E.2d 305, 309 (2003)). The whole record test

> requires the reviewing court to determine if the DHC's findings of fact are supported by substantial evidence in view of the whole record, and whether such findings of fact support its conclusions of law. Such supporting evidence is substantial if a reasonable person might accept it as adequate backing for a conclusion. The whole-record test also mandates that the reviewing court must take into account any contradictory evidence or evidence from which conflicting inferences may be drawn. Moreover, in order to satisfy the evidentiary requirements of the whole-record test in an attorney disciplinary action, the evidence used by the DHC to support its findings and conclusions must rise to the standard of clear[, cogent,] and convincing. Ultimately, the reviewing court must apply all the aforementioned factors in order to determine whether the decision of the lower body, e.g., the DHC, has a rational basis in the evidence.

*Talford*, 356 N.C. at 632, 576 S.E.2d at 309-10 (citations, quotation marks, and footnotes omitted).

> [T]he following steps are necessary as a means to decide if

a lower body's decision has a rational basis in the evidence: (1) Is there adequate evidence to support the order's expressed finding(s) of fact? (2) Do the order's expressed finding(s) of fact adequately support the order's subsequent conclusion(s) of law? and (3) Do the expressed findings and/or conclusions adequately support the lower body's ultimate decision?

*Id.* at 634, 576 S.E.2d at 311 (quotation marks omitted). "[T]he mere presence of contradictory evidence does not eviscerate challenged findings, and the reviewing court may not substitute its judgment for that of the [DHC]. The DHC determines the credibility of the witnesses and the weight of the evidence." *Adams*, __ N.C. App. at __, 769 S.E.2d at 411 (quotation marks and citations omitted).

N.C. Gen. Stat. § 84-28 governs attorney discipline and provides five levels of punishment for misconduct: disbarment, suspension, censure, reprimand, and admonition. N.C. Gen. Stat. § 84-28(c) (2013). In *Talford*, the Court explained as follows:

[T]he statutory scheme set out in [N.C. Gen. Stat.] § 84-28 clearly evidences an intent to punish attorneys in an escalating fashion keyed to: (1) the harm or potential harm created by the attorney's misconduct, *and* (2) a demonstrable need to protect the public. Thus, we conclude that in order to merit the imposition of "suspension" or "disbarment," there must be a clear showing of how the attorney's actions resulted in significant harm or potential significant harm to the entities listed in the statute, *and* there must be a clear showing of why "suspension" and "disbarment" are the only sanction options that can adequately serve to protect the public from future transgressions by the attorney in question.

In sum, then, it is clear to this Court that each level of

> punishment in the escalating statutory scheme: (1) requires its own particular set of factual circumstances in order to be imposed, and (2) is measured in light of how it will effectively provide protection for the public. Thus, upon imposing a given sanction against an offending attorney, the DHC must provide support for its decision by including adequate and specific findings that address these two key statutory considerations.

356 N.C. at 637-38, 576 S.E.2d at 313. Yet, citing *N.C. State Bar v. Nelson*, 107 N.C. App. 543, 421 S.E.2d 163 (1992), defendant admits that the choice of which sanction is most appropriate rests in the discretion of the DHC.

A disciplinary proceeding consists of an adjudicatory phase, in which the DHC determines whether the defendant committed the offense or misconduct, and a dispositional phase, in which the DHC determines the appropriate sanction. *See Talford*, 356 N.C. at 634, 576 S.E.2d at 311. "[T]he whole-record test must be applied separately to each of the two phases." *Id.* Although defendant mentions a lack of evidence supporting finding and conclusions in both the adjudicatory and dispositional phases, defendant only challenges findings and conclusions related to the discipline imposed. Thus, we accept the DHC's findings and conclusions concerning adjudication and limit our review to the dispositional phase.

Specifically, defendant contends the DHC's "findings and conclusions do not address the degree of potential harm that [his] acts and omissions might cause, why disbarment would be necessary to protect the public, or how [his] failure to maintain accurate records threatens the public, the legal profession, or the administration of

justice." Defendant then compares his case to *Talford*. Upon review, we find this case distinguishable from *Talford* and, applying the *Talford* analysis, hold the DHC did not err or abuse its discretion in disbarring defendant.

Defendant takes issue with a number of the DHC's findings. As noted above, we review the DHC's findings to determine whether they are supported by substantial evidence; that is clear, cogent, and convincing evidence. *See id.* at 632, 576 S.E.2d at 309-10. In the dispositional phase, the DHC issued the following nine findings of fact:[2]

1. Defendant was issued an Admonition in November 2004 for neglecting a client matter.

2. Ms. Faggins, the administratrix of the Estate of Bruce Jacobs, was unaware that the settlement funds Defendant had received were no longer in his trust account. Ms. Faggins repeatedly requested that the funds be transferred to the clerk of court or that the Clerk be provided copies of bank statements indicating the funds are on deposit with Defendant. Defendant was unable to take these steps as the funds were no long [sic] in his account.

3. Ms. Locklear, the administratrix of the Estate of Samuel Locklear, has been unable to close out the estate or pay out the funds due to their heirs. The funds from Ms. Locklear's personal injury case have not been paid out to her since her case was settled in November 2010.

4. Because of their experiences with Defendant, Ms. Faggins and Ms. Locklear no longer trust attorneys to

---

[2] The DHC misnumbered the findings, labeling two findings with the number 6.

act in their best interests.

5. Although Defendant testified that he made arrangements to have sufficient funds to cover the deficiencies in the trust account, Defendant has not paid restitution to the clients whose funds should be held in his general trust account.

6. Defendant's comingling of his funds in the trust account, by failing to promptly withdraw his earned fees from a client's settlement funds, was motivated by his desire to prevent the IRS from seizing the funds from his operating account.

6. The crimes of embezzlement, forgery and uttering are felonies.

7. Defendant was diagnosed in 2011 with adjustment disorder and mild cognitive disorder. In 2013 he was again diagnosed with adjustment disorder and mild cognitive disorder by history.

8. Several of Defendant's colleagues and his pastor believe Defendant is truthful, trustworthy and a good attorney.

On appeal, defendant identifies findings 1, 3, 5, and 7 as illustrative of the deficiencies in the DHC's order of discipline. Although defendant identifies the above findings, he only contests the evidence to support finding 3. His arguments regarding the remaining findings concern whether the findings support the DHC's conclusions in the order of disbarment. Nevertheless, we note that findings 1, 5, and 7 are supported by substantial evidence.

In support of finding 3, Ms. Locklear testified she never received any money from the settlement and has not been able to pay out funds from the Estate of Samuel

Locklear. Ms. Locklear, however, acknowledged receiving a letter from defendant dated 31 March 2011 informing her that defendant was holding money for the estate and advising that she needed to come to his office and sign papers authorizing defendant to pay out the funds. Thus, while finding 3 is supported by the evidence, the insinuation that Ms. Locklear was unable to close out the estate because of defendant's actions is not founded in the evidence and is not a valid reason to base punishment.

Yet, we hold the findings are sufficient to support the trial court's conclusions absent consideration of finding 3. Likewise, we find the DHC issued adequate conclusions to support the order of disbarment. Specifically, the DHC issued conclusions showing that it considered the factors provided in Section .0114(w) of the North Carolina State Bar Rules and Regulations. The DHC then listed each factor that it found present in this case. We find the DHC's findings support its conclusions that the factors listed are present. The DHC then issued conclusions indicating it considered lesser alternatives to disbarment but determined the lesser alternatives would not be sufficient to protect the public, the profession, and the administration of justice. Among the reasons disbarment was the only suitable punishment, the DHC explained that "[d]isbarment is the only sanction that requires Defendant to

demonstrate reformation before he may resume the practice of law."[3] The DHC found this important, recognizing that "[p]rotection of the public requires that Defendant not be permitted to resume the practice of law unless and until he demonstrates that he has reformed, that he understand his obligations as an attorney, officer of the court, and as a citizen of this state and country."

After a thorough review of the order of discipline, we hold the findings and conclusions issued by the DHC were sufficient to show significant harm to the public and the legal profession caused by defendant's numerous rule violations and to show why disbarment was the only appropriate sanction.

## III. Conclusion

For the reasons discussed, we affirm the DHC's order of discipline disbarring defendant from the practice of law in North Carolina.

AFFIRMED.

Judges CALABRIA and DIETZ concur.

Report per Rule 30(e).

---

[3] Defendant argues the DHC's reasoning is flawed because suspension may also require a demonstration of reformation. While a demonstration of reformation may be shown as a condition to stay a suspension, the suspension may not exceed five years, at which time the suspension ends without a demonstration of reformation. *See* N.C. Gen. Stat. § 84-28(c).